# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* TIEN H. TRAN, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 11-cv-0852 (KBJ) |
| COMPUTER SCIENCES CORPORATION, *et al.* | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Relator Tien H. Tran ("Relator" or "Tran") brings this action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 (2013), seeking to challenge the contracting practices of Defendant Computer Sciences Corporation ("CSC") with respect to a particular government contract. Under the contract at issue, CSC agreed to serve as a prime contractor with respect to certain information technology ("IT") work to be performed for the United States Citizenship and Immigration Service ("USCIS"), and CSC also promised to make a good faith effort to subcontract a certain percentage of the IT work to be performed under the contract to qualified small businesses. The complaint alleges that, rather than comply with its obligations under the contract, CSC set up a scheme in which it would subcontract work to qualified small businesses, such as Defendant Sagent Partners, LLC ("Sagent"), and as a condition of the subcontract, those small businesses would agree to further subcontract the work to large businesses that CSC trusted, such as Defendant Modis, Inc. ("Modis"), in exchange for a small fee. (First Amended Complaint ("Compl."), ECF No. 4, ¶¶ 3-4.) According to the

1

complaint, this "pass-through" scheme violated several provisions of the FCA insofar as it permitted CSC to report to the government that the company had met its small business subcontracting goals when, in reality, large businesses were performing the substantive work under the contract. (*Id.* ¶¶ 4-6.)

Before this Court at present are three motions to dismiss, one filed by each of the three Defendants. Although each Defendant offers a different rationale for dismissing the particular charges that pertain to it, all argue that Relator has failed to state a claim upon which relief can be granted for the purpose of Federal Rule of Civil Procedure 12(b)(6) and that Relator has failed to plead fraud with the requisite particularity as Federal Rule of Civil Procedure 9(b) requires. Because this Court concludes that some of the claims that Relator has made against Defendants CSC and Modis are viable and properly pled when the complaint is liberally construed, but that none of Relator's claims against Defendant Sagent are sufficiently alleged, the Court will **DENY IN PART** and **GRANT IN PART** CSC and Modis's motions to dismiss, and will **GRANT** Sagent's motion to dismiss in full, as explained further below. What remains of this case are Relator's contentions that **(1)** CSC has presented false claims for payment to the government in connection with the government contract at issue and made material false statements in support of those claims; **(2)** CSC fraudulently induced the government into awarding it that contract; **(3)** Modis caused CSC to present the false claims and to make the material false statements; and **(4)** CSC and Modis conspired to commit these violations of the FCA. A separate order consistent with this opinion will follow.

# I.    BACKGROUND

## A. Initial Relationship Between the Parties

The Department of Homeland Security ("DHS") maintains a program through which the agency identifies "prime contractors" that are qualified to perform specific contracts for IT services that DHS and any of its constituent agencies—including USCIS—require.  (Compl. ¶ 21 (describing DHS's Enterprise Acquisition Gateway for Leading Edge Solutions ("EAGLE") program).)  Defendant CSC is an approved EAGLE prime contractor.  (*Id.* at 19.)  Each contract awarded under the EAGLE program is broken down into a series of "task orders" of limited duration, and at the end of the prescribed period for each task order, DHS awards a new task order through a competitive bidding process amongst EAGLE-approved prime contractors.  (*Id.* ¶ 19.)

CSC has been the recipient of task orders on a particular USCIS contract (the "Prime Contract") since the early 2000s.  (*Id.*)  Under the Prime Contract, CSC is required to provide IT personnel to USCIS to work on a variety of technology initiatives.  (*Id.* ¶ 52.)  In order to provide the necessary personnel to USCIS for each task order awarded under the Prime Contract, CSC entered into subcontracting relationships with various other companies in the business of providing IT personnel.  (*Id.* ¶ 56.)  Defendant Modis was one of these companies.  (*Id.* ¶¶ 13, 56.)  According to the complaint, Modis is a large business (*id.* ¶ 13) that is the subcontractor CSC most heavily relied upon to provide personnel to CSC, which in turn placed those persons with USCIS in order to fulfill its obligations under the Prime Contract.  (*Id.* ¶ 57.)

Significantly, Modis also relied on subcontracting to provide the personnel that CSC required from it for the Prime Contract.  Infotran, a small business owned by

Relator Tran, was one of the companies with which Modis had a subcontracting agreement. (*Id.* ¶ 74.) Modis and Infotran entered into this agreement in April of 2006. (*Id.*) According to the complaint, the subcontracting agreement between Modis and Infotran contained a non-compete clause that stated that Infotran could not enter into any direct contractual relationship with CSC while it maintained its subcontracting agreement with Modis (and for one year thereafter). (*Id.*)

Thus, initially, CSC operated as the prime contractor placing personnel with USCIS under the Prime Contract, Modis was a direct subcontractor of CSC, and Infotran was a second-tier subcontractor who had a contractual relationship only with Modis, but provided personnel to Modis whom Modis then designated to perform work for CSC under the Prime Contract.[1]

### B. The September 2008 Task Order And CSC's Small Business Subcontracting Plan

As noted above, the Prime Contract was awarded periodically in the form of task orders that were subject to competitive bids that EAGLE-approved prime contractors submitted. In May of 2008, CSC bid on a task order under the Prime Contract that is hereinafter referred to as the "September 2008 Task Order." (*Id.* ¶¶ 3, 58.) As a part of its bid, CSC included a "Small Business Subcontracting Plan" in which it represented that, if it was awarded the task order, a minimum of 40% of the money that it paid out to subcontractors for personnel supplied to perform work under the task order would go to qualified "small business concerns." (*Id.* ¶ 59.)[2] According to the complaint, if CSC

---

[1] The complaint does not contain any allegations regarding Defendant Sagent's relationship with CSC, Modis, or Infotran prior to the events described *infra*.

[2] The Small Business Act defines a "small business concern" as "one which is independently owned and operated and which is not dominant in its field of operation[.]" 15 U.S.C. § 632(a)(1). Furthermore,

had not included the Small Business Subcontracting Plan in its bid, then it would not have been eligible to compete for the September 2008 Task Order. (*Id.* ¶ 62.) CSC was eventually awarded the task order—valued at over $200 million—on September 29, 2008. (*Id.* ¶ 63.)

Under the September 2008 Task Order and the applicable federal contracting regulations (specifically, 48 C.F.R. § 52.219-9(1)), CSC was also required to submit to USCIS semi-annual "Individual Subcontract Reports" ("ISRs") and "Summary Subcontractor Reports" ("SSRs") detailing CSC's compliance with its Small Business Subcontracting Plan. (*Id.* ¶ 37.) The complaint alleges that "[i]n order for a particular Small Business to count towards the goals set out in [the] Small Business Subcontracting Plan, the Small Business must actually perform the work described in the subcontracting plan—the work cannot be performed by a second tier subcontractor or by an entity that is not a Small Business." (*Id.*) Additionally, the complaint alleges that the Prime Contract required CSC to submit invoices periodically to USCIS for the amounts due to CSC from its work on the Prime Contract. (*Id.* ¶¶ 185-86.) The complaint further states that CSC in fact did submit such invoices, and that those invoices were paid. (*Id.*)

### C. The "Pass-Through" Proposal

The complaint alleges that neither CSC nor Modis qualify as "small business concerns" under the criteria that the Small Business Administration has set forth. (*Id.* ¶¶ 12-13.) Thus, the personnel that CSC sourced from Modis could not count towards

---

the Act allows the Administrator of the Small Business Administration to define additional criteria by which business can qualify for status as a "small business concern." *Id.* § 632(a)(2)(A). These criteria are contained in the regularly-published "Size Standard Table," available at http://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf (last visited July 3, 2014). At all times relevant herein, Infotran qualified as a small business concern. (Compl. ¶ 11.)

CSC's small business subcontracting goals under the September 2008 Task Order. (*Id.* ¶¶ 6, 10.) According to the complaint, Ken Harvey, CSC's program manager for the Prime Contract, recognized in the run-up to CSC's bid for the September 2008 Task Order that CSC would have to find a way to increase the percentage of its subcontracting that went to qualified small business concerns in order to win the task order. (*Id.* ¶ 77.) The complaint asserts that, to remedy this problem, Harvey approached Tim Martin, Modis's sales director, in September of 2007, to discuss CSC's need to increase the amount of subcontracting work it awarded to small businesses. (*Id.*) Martin subsequently approached Tran and proposed that Infotran, which was a qualified small business concern, become a direct subcontractor of CSC in order to allow CSC to increase the percentage of its subcontracting that was awarded to small businesses. (*Id.* ¶ 78.) In the arrangement Martin proposed to Tran, once Infotran had formed a direct subcontracting agreement with CSC, Infotran would use exclusively Modis personnel to fulfill its obligations to CSC, and would be paid a small fee per each hour of labor performed by personnel sourced from Modis through Infotran. (*Id.*) In other words, the complaint alleges that Modis proposed an arrangement whereby Modis and Infotran would essentially switch places vis-à-vis CSC. The purpose of this arrangement, according to the complaint, was to allow Modis to pass personnel through Infotran to CSC, thereby allowing CSC to report those personnel as coming from a small business (Infotran), when in reality they were coming from a large business (Modis).

Tran alleges that he refused to participate in this "pass-through" scheme when it was first proposed in September of 2007. (*Id.* ¶ 79.) Nevertheless, on April 11, 2008,

Infotran, allegedly with the consent of Modis, entered into a direct subcontracting agreement with CSC. (*Id.* ¶ 80.) The complaint alleges that, by the terms of this contract, Infotran agreed to provide personnel to perform certain services for CSC under the Prime Contract, but never agreed to use Modis personnel in fulfillment of those obligations. (*Id.* ¶¶ 80-82.)

Apparently, Infotran was not the only small business that Modis approached about setting up a pass-through arrangement. According to the complaint, CSC preferred to work with larger businesses (such as Modis) for reasons of efficiency, despite its contractual commitment to utilizing qualified small business subcontractors. (*Id.* ¶ 83.) For this reason, Modis allegedly formed pass-through relationships with several small-businesses, including Defendant Sagent. (*Id.* ¶¶ 87-91.) The complaint claims that the structure of these relationships mirrored the structure that Tim Martin had proposed to Infotran in September of 2007; that is, Modis would encourage small businesses, such as Sagent, to form a direct relationship with CSC, with the understanding that those small businesses would fulfill any of CSC's requests for personnel through subcontracts with a larger company such as Modis. That larger company would then provide the personnel, and the small business would keep a small fee as a commission for its role as a conduit. (*See, e.g.*, *id.* ¶¶ 92-100.) According to the complaint, this pass-through system permitted CSC effectively to eschew its small business subcontracting obligations, but nevertheless report that it had met its goal of allocating 40% of its subcontractor spending to small businesses as the Small Business Subcontracting Plan directed, despite the fact that employees of large businesses were

performing almost all of the actual work under the September 2008 Task Order. (*Id.* ¶ 100.)

### D. Modis's Lawsuit Against Infotran

In October of 2008, four months after Infotran entered into its direct subcontracting agreement with CSC, CSC first asked Infotran to provide personnel for work to be performed under the September 2008 Task Order. (*Id.* ¶¶ 115, 144.) In response, Infotran allegedly submitted two of its own employees to CSC for the open positions. (*Id.*) According to the complaint, Tim Martin of Modis subsequently called Tran to complain about Infotran's actions, including threatening Infotran with legal action should it again attempt to place its own employees with CSC, rather than simply playing a role as a conduit for Modis employees. (*Id.* ¶¶ 117, 146.) Martin allegedly told Tran that Modis had only agreed to waive enforcement of the non-compete clause in Infotran's contract with Modis—the waiver that had enabled Infotran to enter into a direct subcontracting agreement with CSC—on the condition that Infotran would provide personnel to CSC only with the guidance and consent of Modis. (*Id.* ¶¶ 118-20.)

In March of 2009, Infotran again placed one of its own people with CSC when a position became open under the September 2008 Task Order, without consulting Modis. (*Id.* ¶ 150.) The complaint alleges that, in response, Martin sent Tran a long email stating in part that "Modis has elected to allow Infotran[] to obtain a subcontract with CSC for the sole purpose of acting as a small business conduit for Modis to continue to provide resources to CSC while helping them meet their small business quota" and that

"[a]t no time did Modis agree to waive its non-compete to allow Infotran[] to provide direct staffing services to CSC . . . without Modis participation." (*Id.* ¶ 150.)

On June 5, 2009, Modis filed a breach of contract action against Infotran in the United States District Court for the District of Columbia, alleging that Infotran had violated the non-compete clause in its contract with Modis. (*Id.* ¶ 152; *see also Modis, Inc. v. Infotran Systems, Inc.*, 09-cv-1051-RWR (D.D.C. 2009) ("*Modis v. Infotran*").)[3] The complaint alleges that Modis brought that lawsuit as retaliation for Infotran's refusal to participate in the pass-through scheme. (Compl. ¶ 159.) Moreover, the complaint states that after Modis commenced litigation against Infotran, CSC allegedly "froze out" Infotran from receiving new opportunities under its EAGLE contract from approximately May 2009 through November 2010, and eventually officially terminated its relationship with Infotran. (*Id.* ¶¶ 153-54.) Relator alleges that these actions were also taken in retaliation for Infotran's refusal to participate in the pass-through scheme. (*Id.* ¶ 160.)[4]

### E. Tran Files The Instant FCA Complaint Against CSC, Modis, And Sagent

Tran filed the original complaint in the instant case on May 5, 2011, and amended the complaint on October 17, 2011. (ECF Nos. 1, 4.) Tran alleges five counts under the FCA in relation to the alleged pass-through arrangement: (1) Presentation of

---

[3] That action was actively litigated for over 3 years and settled in early 2013. Tran relies in large part on the discovery record from *Modis v. Infotran* (including extensive deposition testimony from the key players at CSC and Modis) to support his claims in the instant case.

[4] Infotran filed a counterclaim in *Modis v. Infotran* for tortious interference with business or contractual relations, alleging that Modis had improperly pressured CSC to stop working with Infotran. The Court granted summary judgment for Modis on the counterclaim, on the grounds that Infotran had adduced no evidence that any statements made by Modis to CSC were "slander, libel, knowingly false, or even untrue" as required to prove the tortious interference claim. *See Modis, Inc. v. InfoTran Systems, Inc.*, 893 F. Supp. 2d 237, 242 (D.D.C. 2012).

False Claims in violation of 31 U.S.C. § 3729(a)(1)(A), against all Defendants (the "Presentation" count); (2) Fraudulent Inducement in violation of 31 U.S.C. § 3729(a)(2), against CSC only (the "Fraudulent Inducement" count) [5]; (3) Making Material False Statements in violation of 31 U.S.C. § 3729(a)(1)(B), against all Defendants (the "Material False Statements" count); (4) Conspiracy to Present False Claims and Make Material False Statements in violation of 31 U.S.C. § 3729(a)(1)(C), against CSC and Modis (the "Conspiracy" count); and (5) Retaliation in violation of 31 U.S.C. § 3730(h), against CSC and Modis (the "Retaliation" count). The United States declined to intervene in this action on October 4, 2012, and the Court subsequently entered an order unsealing the Amended Complaint. (ECF Nos. 9, 10.)

Defendants were served with the amended complaint on December 11, 2012, and on January 11, 2013, Defendants filed the three motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) that are now before this Court. (ECF Nos. 29, 30, 32.) [6]

## II.  **LEGAL LANDSCAPE**

### A. Legal Standard For Motion To Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must comply with Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a). This

---

[5] Relator's fraudulent inducement claim arises under the pre-2009 version of the FCA. The relevant section in the current version of the statute is section 3729(a)(1)(B). *See infra* n. 9.

[6] The motions were fully briefed on February 7, 2013, and this Court held a motions hearing on July 16, 2013, and subsequently took the motion under advisement.

requirement is meant to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

"Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133 (D.D.C. 2013) (quoting *Twombly*, 550 U.S. at 555). In other words, the plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Mere conclusory statements" of misconduct are not enough to make out a cause of action against a defendant. *Id.* Rather, a complaint must contain sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

In deciding whether to grant a motion to dismiss under Rule 12(b)(6), "[t]he court must view the complaint in [the] light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Busby*, 932 F. Supp. 2d at 134 (citation omitted). Even so, the court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint[.]" *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor is the court "bound to accept as true a legal conclusion

couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

### B. Legal Standard For Motion To Dismiss Under Rule 9(b)

Federal Rule of Civil Procedure 9(b) applies to FCA actions. *See U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) (noting that every circuit to consider the issue has held that Rule 9(b) applies to FCA complaints). That rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake[,]" but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b), which are: to "ensure that defendants have adequate notice of the charges against them to prepare a defense[,]" *U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003); to discourage "suits brought solely for their nuisance value" or as "frivolous accusations of moral turpitude[,]" *U.S. ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981); and to "'protect reputations of . . . professionals from scurrilous and baseless allegations of fraud[.]'" *Id.* at 1385 n. 103 (alteration in original) (quoting *Felton v. Walston & Co., Inc.*, 508 F.2d 577, 581 (2d Cir. 1974)).

Rule 9(b) does not abrogate Rule 8, and must be read in light of Rule 8's requirement that allegations be simple, concise, and direct, and short and plain statements of each claim. *Joseph*, 642 F.2d at 1386; *see also U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 269 (D.D.C. 2002) ("While . . . Rule 9(b) requires more particularity than Rule 8, . . . Rule 9(b) does not

completely vitiate the liberality of Rule 8."). In an FCA action, Rule 9(b) requires that the pleader "'state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud[,]' . . . [and] individuals allegedly involved in the fraud." *U.S. ex rel. Williams v. Martin–Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *Kowal*, 16 F.3d at 1278). "In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able to 'defend against the charge and not just deny that they have done anything wrong.'" *Williams*, 389 F.3d at 1259 (quoting *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001)); *accord McCready*, 251 F. Supp. 2d at 116 (noting that a court "'should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts'" (quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999))).

### C. The Small Business Act

The Small Business Act, 15 U.S.C. §§ 631-657s (2013), governs much of the federal government's procurement policy towards small businesses. The very first section of that law provides clear insight into the law's animating purpose and Congress's intent in passing it:

> The essence of the American economic system of private enterprise is free competition. . . . The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and

> developed. *It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns* in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631(a) (emphasis added).

Specifically with respect to contracts that the federal government enters into, section 637(d)(1) of Title 15 of the U.S. Code provides that "[i]t is the policy of the United States that small business concerns . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency[.]" In furtherance of this goal, section 637(d)(4) provides that government contractors who wish to bid on contracts of more than $500,000 shall "negotiate with the procurement authority a subcontracting plan which incorporates" certain contract clauses that relate to the federal government's policy towards small business and the contractor's obligations with respect to that policy. This plan is a requirement for any large government contract, because "[n]o contract shall be awarded to any offeror unless the procurement authority determines that the plan . . . provides the maximum practicable opportunity for small business concerns . . . to participate in the performance of the contract." 15 U.S.C. § 637(d)(4)(D).

The implementing regulations of section 637(d)(4), found at 48 C.F.R. § 19.702, provide further detail: "Any contractor receiving a contract [meeting the size threshold for contracts of its type] must agree in the contract that small business[es] . . . will have

the maximum practicable opportunity to participate in contract performance consistent with its efficient performance." 48 C.F.R. § 19.702.[7] Moreover, the regulations explicitly state that the statute requires that any government contractor (whether negotiating for or bidding on a contract) must submit a Small Business Subcontracting Plan or be deemed ineligible. 48 C.F.R. § 19.702(a).

Significantly, Congress has also expressly provided that "the failure of any contractor or subcontractor to comply in good faith with [the terms of a Small Business Subcontracting Plan] *shall be a material breach of such contract or subcontract*[.]" 15 U.S.C. § 637(d)(9) (emphasis added); *see also* 48 C.F.R. § 52.219-9(k) (same). Elaborating on the "good faith" standard found in the statute, the applicable regulations provide that "[f]ailure to make a good faith effort to comply with the subcontracting plan means willful or intentional failure to perform in accordance with the requirements of the subcontracting plan, or willful or intentional action to frustrate the plan." 48 C.F.R. § 19.701.

### D. The False Claims Act

The FCA was originally enacted in 1863 and has been amended several times over the past 150 years, including as a part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which was enacted on May 20, 2009. The current, post-FERA version of the FCA provides a cause of action for private parties, known as "relators," to bring suits on behalf of the federal government for false or fraudulent statements made to the government. Specifically, and in relevant part, the FCA establishes

---

[7] The bulk of Title 48 of the Code of Federal Regulations (also known as the Federal Acquisition Regulation or "FAR"), which is found in Part 52, codifies specific contractual clauses that must be included in various circumstances in government procurement contracts. Section 52.219-9 of Title 48 of the CFR provides the required contractual language regarding Small Business Subcontracting Plans.

liability for any person who "(A) knowingly presents, or causes to be presented, a false

or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to

be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation" of, *inter alia*, paragraphs (A) or (B). 31 U.S.C

§ 3729(a)(1)(A)-(C).[8]

Claims brought under prong (a)(1)(A) of section 3729 are commonly referred to

as "presentment" claims, and "allow[] a court to impose liability on a defendant for

presenting a direct false claim or a false certification to the government." Joel M.

Androphy, *Federal False Claims Act and Qui Tam Litigation*, § 4.03[1] (2013).

Moreover, it is well established that prong (a)(1)(B) of section 3729 not only permits

legal action for making or causing material false statements, but also encompasses a

cause of action based on a theory of fraudulent inducement. *See U.S. ex rel. Bettis v.

Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005). This theory

prescribes liability "for each claim submitted to the Government under a contract which

was procured by fraud, even in the absence of evidence that the claims were fraudulent

in themselves." *Id.*; *see also* S. Rep. No. 99–345, at 9 (1986), *reprinted in* 1986

U.S.C.C.A.N. 5266, 5274 ("[E]ach and every claim submitted under a contract, loan

guarantee, or other agreement which was originally obtained by means of false

---

[8] As defined in the FCA, the term "claim"

(A) means any request or demand, whether under a contract or otherwise, for money or property . . . that—
    (i) is presented to an officer, employee, or agent of the United States; or
    (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
        (I) provides or has provided any portion of the money or property requested or demanded; or
        (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.").

In addition to establishing a cause of action against individuals who submit false claims and/or make or cause false statements that are material to false claims (including fraudulent inducement), the FCA also provides some measure of protection for retaliation against relators who choose to bring charges against their employers or business partners on behalf of the government. Section 3730(h) provides that

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the FCA].

31 U.S.C. § 3730(h).[9]

## III.  ANALYSIS

The instant complaint alleges five different FCA-related counts that concern the establishment and maintenance of a pass-through scheme to facilitate CSC's allegedly fraudulent representation to the government that the small business requirements of the

---

[9] Notably, due to the timing of the relevant allegations of fact in this case, three of the five counts in Relator's complaint arise wholly or in part under the pre-FERA version of the FCA. The Fraudulent Inducement count (Count II) alleges that CSC made material false statements in May of 2008 in connection with its submission of the Small Business Subcontracting Plan required to obtain the September 2008 Task Order. (*See* Compl. ¶¶ 201-209.) This count therefore arises under a version of the statute that was in effect prior to May 20, 2009, and that established liability for "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved." 31 U.S.C. § 3729(a)(2) (2008). Additionally, some of the allegations germane to Tran's Presentment and Conspiracy counts (Counts I and IV) also arise under the pre-FERA version of the FCA due to the fact that the actions described in the complaint occurred both before and after that amendment. However, because the Court's analysis of the Presentation and Conspiracy counts is not affected by the changes that the FERA amendment wrought, *see, e.g.*, *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010), the timing of the FERA amendment is relevant only to the analysis of Relator's Fraudulent Inducement claim. (*See infra*, Part III.A.3.)

September 2008 Task Order had been fulfilled, and these counts generally fall into three

categories. First, there are the counts that maintain that Defendants submitted false

claims or made false statements, or caused such false claims or statements to be made,

in violation of subparagraphs (A) and (B) of section 3729(a)(1) of the FCA—these are

Relator's Presentment, Material False Statements, and Fraudulent Inducement counts

(Counts I, II, and III). Second, there is Relator's Conspiracy count (Count IV), which

alleges a violation of section 3729(a)(1)(C) and is based upon the alleged agreement

between CSC and Modis to implement the pass-through scheme. And third, there is

Relator's Retaliation count (Count V), which alleges that CSC and Modis violated

section 3730(h) of the FCA. In assessing the adequacy of the complaint in light of

Defendants' motions to dismiss, the Court will analyze each of these three categories of

allegations in turn. Moreover, because certain of the counts are applicable only to

certain of the Defendants, and because there are significant differences in the roles that

each Defendant allegedly played with respect to the pass-through scheme, the Court

will, where applicable, examine the allegations within each of these broader categories

separately for each Defendant.

### A. Relator's Core FCA Counts: Presentment, Material False Statements, and Fraudulent Inducement

The first category of counts includes those counts that are directly based on the

allegedly false submissions that CSC made to the government in connection with the

September 2008 Task Order. According to the complaint, these false submissions

include (a) the invoices that CSC submitted to the government in order to get paid

under the task order; (b) the various reports (ISRs and SSRs) that CSC submitted to the

government certifying that it was in compliance with the Small Business Subcontracting

Plan; and (c) the allegedly fraudulent Small Business Subcontracting Plan itself.

Defendants make numerous specific arguments for dismissal of each Relator's fraud

counts under Rules 12(b)(6) and (9)(b); however, the briefing reveals that CSC's

overarching contention is that *all* of Relator's fraud claims fail as a matter of law

because the pass-through scheme as alleged in the complaint is perfectly legal. (*See*

CSC's Mem. in Supp. of Mot. to Dismiss ("CSC Br."), ECF No. 30-1, at 10-14.) This

Court has considered CSC's repeated assertion that nothing about the situation

described in the complaint is in any way fraudulent and will address that argument

before turning to Relator's specific allegations concerning each of the core FCA

violations. As explained below, the Court does not accept CSC's contention that the

entire case must be dismissed simply and solely because the legality of the alleged pass-

through scheme is indisputable.

### 1. The Alleged Pass-Through Scheme Is Not Unquestionably Authorized

CSC insists that Tran has failed to state a claim upon which relief can be granted

because federal law and regulations condone the very behavior that Tran contends is

fraudulent. (*See* CSC Br. at 10-14.) In support of this assertion, CSC points to section

52.219-14 of Title 48 of the C.F.R., which is a regulation mandating that the recipients

of certain government contracts—namely, small business "set-aside" service

contracts—must abide by the following contractual provision: "At least 50 percent of

the cost of contract performance incurred for personnel shall be expended for

employees of the [small business]." (CSC Br. at 12 (quoting 48 C.F.R. § 52-219-14

("Limitations on Subcontracting")).) CSC reasons that the regulatory requirement that

small businesses fulfilling set-aside service contracts spend at least 50% of the cost of

contract performance on small business personnel must mean that "small business subcontractors are *not* prohibited from further subcontracting to large businesses." (CSC Br. at 9 (emphasis added).)  And, by this logic, if small businesses that receive set-aside service contracts from the government are allowed to subcontract up to 50% of the work performed on those contracts to large businesses without losing their status as small business subcontractors, then pass-through arrangements such as the one alleged in Relator's complaint are perfectly acceptable under the regulations governing federal contracting.  (CSC Br. at 12.)

CSC's logic requires far too many leaps to be persuasive.  First of all, a regulatory requirement that small businesses that have won set-aside contracts must spend at least 50% of their payroll expenses on their own employees says nothing about how the other 50% of the cost of contract performance is to be fulfilled, much less that the small business concern can appropriately subcontract that work to a single large business, as CSC assumes.  Moreover, and even more significantly, CSC concedes that the contracts at issue here are *not* "set-aside" service contracts at all, and thus do not even contain the vaunted 50% requirement upon which CSC relies.  It would be one thing for CSC to infer that the government has blessed the challenged pass-through scheme if the 50% requirement applied in the instant context.  But CSC is effectively asking this Court to draw supportive conclusions from a *double* negative:  not only regulatory silence regarding the applicability of any 50% requirement to non-set aside contracts, but also the policymakers' failure to include any more restrictive requirement related to subcontracting in the statutes and regulations that do apply to the instant circumstances.  (*See* CSC Br. at 12 (heralding the 50% requirement in the set-aside

context, and noting that "there is no more stringent limitation applicable when Federal prime contractors like CSC are subcontracting to small businesses"). CSC does not explain why—as a matter of pure statutory interpretation—total silence in a regulation or statute regarding the manner in which small businesses are permitted fulfill their contracting needs in the circumstances at bar should be interpreted as evidence of an intent to bless the pass-through arrangement. (*See, e.g.*, *id.* (asserting without support that "[t]he ability of small businesses to subcontract to large businesses under 'set aside' contracts is conclusive that CSC has not made any false claims or statements as alleged").) And, indeed, the opposite inference is ordinarily drawn in similar circumstances. *See, e.g.*, *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("'[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

CSC's argument that the required "set-aside" contract provisions demonstrate lawful action here is also belied by Congress's clear purpose in establishing the 50% requirement in the small business set-aside context. Small business "set-aside" contracts are government contracts that are reserved exclusively for small businesses. *See* 48 C.F.R. § 19.501(a). As noted above, Congress has expressed a clear intent to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns[,]" 15 U.S.C. § 631(a), and permitting small businesses to obtain and fulfill government contracts in a flexible manner furthers this ultimate goal. CSC apparently assumes that there is an equivalence between, on the one hand, a small business that has

won a contract exclusively reserved for small businesses and seeks out additional help in fulfilling that contract through further subcontracting, and, on the other, a large business that has won a contract in part by promising to utilize small businesses to fulfill that contract, but then fulfills those commitments by utilizing the services of another large business through the application of a pass-through scheme.  But there is a significant difference:  in the former example, it is reasonable to conclude that the policy goals of the Small Business Act would be furthered if small businesses are afforded the opportunity to be the "prime" contractors on certain government contracts, even if those businesses did not have the capacity to fulfill more than 50% of such contracts; while in the latter example, small businesses serve as little more than fronts used to construct a façade of compliance in a manner that arguably undermines, rather than furthers, the goals of the Small Business Act.  Thus, to the extent that CSC's central defense in the instant litigation (*i.e.*, that the pass-through scheme is lawful) rests on the contention that policymakers must have intended to permit pass-through schemes such as the one at issue here as evidenced by the 50% requirement that applies to set-aside subcontracting, CSC has constructed its primary bulwark on a shaky foundation.  Moreover, and in any event, this argument—which flies in the face of the Small Business Act and its purpose—is manifestly insufficient to demonstrate conclusively that the instant pass-through scheme has congressional imprimatur and thus that Relator here has failed to state a claim upon which relief can be granted as a matter of law.

Notably, CSC's only additional linchpin for its pass-throughs-are-clearly-permissible point—the assertion that regulations permit second-tier subcontracting

arrangements (*see* CSC Br. at 13)—does little to bolster its argument. Section 52.215–222 of FAR requires subcontractors to disclose any additional fees charged for the use of second-tier subcontractors provided that the subcontractor intends to transfer at least 70% of the work awarded to it to a second-tier subcontractor. CSC argues that this provision proves that the government is fully aware that second-tier subcontracting occurs and that it often includes additional expenses. (CSC Br. at 13.) But the clause CSC points to is a *general* contracting provision that is unrelated to any small business requirements and has no application to the charges Relator brings against CSC. Insisting that this Court read a regulation that appears to countenance general second-tier subcontracting to authorize a practice that arguably undermines the clear goals Congress announced in the Small Business Act is a bridge too far under the circumstances presented here. *Cf. SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350 (1943) ("[C]ourts will construe the details of an act in conformity with its dominating general purpose[.]"; *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

This Court concludes, then, that nothing in CSC's motion to dismiss establishes that the challenged pass-through scheme is unquestionably proper such that Relator's complaint, which alleges that the pass-through scheme improperly facilitated the submission of false claims to the government, must necessarily be dismissed.

2. <u>Relator Has Adequately Alleged Presentment And Material False Statements Counts Against CSC And Modis, But Not Against Sagent</u>

Relator's Presentment and Material False Statements counts (Counts I and III of the complaint) are subject to similar legal standards, and therefore, the Court will consider them together in its analysis of whether these counts have been adequately alleged.  These counts are alleged against all three Defendants, and while the factual basis of the counts (that is, the allegedly fraudulent submission of invoices or reports to the government) is the same for each Defendant, there are significant differences in the roles that each Defendant played with respect to the various submissions.  As the party that had actual contractual commitments to the government and the corresponding obligation to certify its compliance with the Small Business Subcontracting Plan, CSC is the primary defendant in this case, and the defendant that was directly responsible for the submissions that form the basis of the Presentment and Material False Statements counts.  Modis and Sagent, by contrast, are, according to the complaint, liable only for "causing" the submission of these allegedly false documents through their exceedingly different levels of involvement with the pass-through scheme.  The Court has considered Relator's Presentment and Material False Statements counts against each of these Defendants separately, and, for the reasons explained below, it concludes that the counts against CSC and Modis survive, but the counts against Sagent must be dismissed.

a. <u>The Presentment And Material False Statements Counts Against CSC</u>

i. *Presentment*

Relator's Presentment count against CSC (Count I) is grounded in Relator's allegations that, under the IT contracts at issue here, CSC regularly presented claims for payment to the government that were knowingly false insofar as CSC was implicitly representing that it had complied with the terms of the Small Business Subcontracting Plan when, due to the nature of the pass-through scheme, CSC had not in fact done so. (Compl. ¶¶ 194-95.) The presentment provision of the FCA forbids any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" to the federal government. 31 U.S.C. § 3729(a)(1)(A). "The elements of a presentment claim are that '(1) the defendant submitted [or caused to be submitted] a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false.'" *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011) (quoting *U.S. ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010)).

Presentment claims under the FCA "take a variety of forms" and do not necessarily require any affirmatively false statement. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) ("*SAIC*"). Rather, a presentment claim can also rest upon a "false certification" theory. This type of presentment claim arises when a claim for payment that is submitted to the government "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Id.* Such false certifications can be either "express" or "implied"; that is, the claim need not necessarily affirmatively state that the submitter has

complied with the relevant requirement, but can also arise from "silence where certification was a prerequisite to the government action sought." *Id.* In order to state a claim for false certification, a plaintiff must not only show the elements listed above, but also that the alleged false representation was "material to the government's decision to pay." *Id.* at 1271.

On their face, Relator's presentment allegations contain all of the elements of a presentment claim based on a theory of implied false certification. First, the complaint clearly and adequately identifies the specific claims that were submitted to the government and states why those claims are alleged to be false. In particular, the complaint states that "CSC submitted claims for payment to the United States periodically" pursuant to the September 2008 Task Order "from November 1, 2008 onward," and that "[e]ach such invoice as submitted by CSC was a false claim" due to the fact that CSC had failed to adhere to a contractual term—*i.e.*, the requirement that a certain percentage of its contracting be parceled out to small businesses. (Compl. ¶¶ 190, 194.) Moreover, the Complaint clearly alleges that CSC "*knowingly* concealed its failure to comply" with the Subcontracting Plan. (*Id.* ¶ 192 (emphasis added).) Finally, Relator has sufficiently alleged that the false certifications were material to the Government's decision to pay the claims. (*See, e.g.*, Compl. ¶ 197 (alleging that the pass-through scheme caused the Government to pay claims it "would not otherwise have paid").)

Relator has also alleged the details of its presentment claim with enough specificity to satisfy Rule 9(b). As explained above, "where an FCA claim is based on a fraudulent 'scheme,' Rule 9(b) mandates only that the details of that scheme be stated

with particularity." *Kane*, 798 F. Supp. 2d at 203.  Here, the complaint describes the nature of the allegedly fraudulent scheme in substantial detail, including identifying the CSC employees who participated in it, the mechanics of the scheme itself, and the reasons why it allegedly constituted a failure to comply with the terms of CSC's contract with the government.  (*See, e.g.*, Compl. ¶¶ 47-49, 130 (identifying CSC management involved in the pass through scheme); ¶¶ 56, 133, 166 (describing the details of the alleged pass-through scheme); ¶ 100 (alleging that large businesses actually performed "the vast majority" of the work ostensibly subcontracted to small businesses).)  Put differently, by identifying the relevant individuals involved in the scheme, the specific claims (*i.e.*, the invoices) that were allegedly false, the time period during which such claims were submitted, the details of how the scheme was structured, and why it constituted non-compliance with the requirements of the September 2008 Task Order, Relator has adequately "provide[d] [CSC] with notice of the who, what, when, where, and how with respect to the circumstances of the fraud" as Rule 9(b) requires.  *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 114 (D.D.C. 2009).

To be sure, the complaint does not relate the specific *dates* on which CSC submitted each of the invoices, but Rule 9(b) does not require as much.  *See, e.g.*, *U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003) (noting that, while "some information on the false claims must be included[,]" Rule 9(b) does not require "a detailed allegation of all facts supporting each and every instance of submission of a false claim"); *U.S. ex rel. Landsberg v. Argentis Med., P.C.*, 03-cv-1263, 2006 WL 1788381, at * 4 (W.D. Pa. June 27, 2006) (explaining that "Rule 9(b) was not intended to require a plaintiff to know every detail before he or she could

plead fraud" and that, especially "in the context of federal FCA cases, the courts have recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years").  Relator has alleged both that the September 2008 Task Order required CSC to submit invoices at regular intervals to the Government, and that CSC did so.  (Compl. ¶¶ 184, 186, 194.)  These allegations provide Defendants with adequate notice of the time and place of the false claims they are accused of submitting.  *See, e.g.*, *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (Easterbrook, J.) (explaining that a relator need not identify specific false invoices at the outset of an FCA action to satisfy Rule 9(b) if the relator has alleged sufficient facts to allow the court to infer that such invoices were submitted to the United States).

## ii.    *Material False Statements*

The same analysis that compels the Court to conclude that the Presentment count is adequately alleged is also applicable to the Material False Statements count against CSC (Count III), and that count survives CSC's motion to dismiss for the same reasons. In order to state a claim under FCA section 3729(a)(1)(B), "a plaintiff must allege that (1) the defendant made or used a 'record or statement;' (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim."  *U.S. ex rel. Hood v. Satory Global, Inc.*, 946 F. Supp. 2d 69, 85 (D.D.C. 2013).  As defined in the statute, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C § 3729(b)(4).  Relator's Material False Statements count against CSC, which is based on CSC's alleged submission of false reports regarding its

compliance with the small business subcontracting requirements, is thus subject to essentially the same legal analysis as the Presentment count; and indeed, CSC itself appears to acknowledge as much by referencing the complaint's allegations of false "claims" and false "statements" interchangeably throughout its brief. (*See, e.g.*, CSC Br. at 14 ("Relator Does Not Identify Any False Claims or Statements").)

Relator's Material False Statements count survives CSC's motion to dismiss because the complaint alleges, with adequate specificity, that CSC made material false statements to the government in the form of its submission of semi-annual reports (ISRs and SSRs) pursuant to 48 C.F.R. § 52.219-9(d)(10)(iii). (Compl. ¶¶ 211-12.) As with the Presentment count, the complaint identifies the specific statements at issue, the reason that they were allegedly false, and CSC's knowledge of their falsity. (*See, e.g.*, Compl. ¶¶ 165-168.) The complaint also states that these allegedly false statements were material to the Government's decision to pay CSC's invoices. (*See id*. ¶¶ 216-217.) Accordingly, Relator has adequately alleged that the submission of the ISRs and SSRs violated the FCA. *See, e.g.*, *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 140 (D.D.C. 2010).

CSC's arguments to the contrary are unavailing. CSC argues that Relator's Presentment and Material False Statements counts must fail because Relator has not alleged that any particular false claim or statement was actually made, and that the best Relator can do regarding the specifics that Rule 9(b) requires is to offer arguments "on information and belief." (CSC Br. at 14-17.) This position appears to be predicated on CSC's overarching belief that, under federal contracting law, a small business may subcontract out to large businesses up to 50% of the cost of a contract without losing its

status as a small business entity under the SBA. *See supra* Part III.A.1. Thus, argues CSC, in order to pass muster under Rule 9(b), Relator's complaint must at the very least allege that the small businesses to whom CSC assigned work under the September 2008 Task Order further subcontracted *more than* 50% of that work to large businesses. (CSC Br. at 14 ("The Relator does not specifically allege that Sagent, or any other small business subcontractor, subcontracted 50% or more of its services from large businesses.").) In CSC's view, without such an allegation, Relator has failed to allege that any claim or statement submitted to the government was actually false, because nothing in the complaint establishes that CSC misrepresented the extent of its compliance with the terms of the Small Business Subcontracting Plan. Of course, this argument fails for the exact same reason that CSC's primary argument fails—that is, the 50% threshold that CSC invokes is not relevant to the contract at issue here because the September 2008 Task Order is not a "set-aside" contract under the terms of the Small Business Act. *See supra* Part III.A.1. In other words, because non-compliance with the 50% requirement is not necessarily the harbinger of wrongful conduct that CSC makes it out to be, this Court concludes that Relator was not specifically required to allege that CSC passed-through more than 50% of the work it assigned to small business subcontractors under the September 2008 Task Order in order to allege a false claim or false statement adequately.

CSC's argument that Relator's "information and belief" allegations are insufficient to satisfy the Rule 9(b) standard is similarly flawed. (CSC Br. at 15-17.) CSC argues only that these statements fail to allege with the requisite specificity "when any specific small business subcontracted work to a large business *to a greater extent*

*than permitted*" under the federal guidelines (CSC Br. at 16 (emphasis added))—again, this Court has already considered, and rejected, the argument that the federal regulations applicable to small business set-aside contracts must be read to sanction the pass-through scheme at issue here. *See supra* Part III.A.1. Moreover, CSC is mistaken to assert that "Relator provides absolutely no facts to establish the basis for his alleged belief that 'the vast majority of subcontracting dollars' actually went to large businesses[,]" and therefore has "failed to plead the how or when of the fraud with any particularity." (CSC Br. at 15-16.) To the contrary, Relator has plead numerous facts from which an inference can be drawn that passing through the vast majority of the work allegedly performed by small businesses was standard operating procedure for CSC and its small business subcontractors. These facts include references in the complaint to sworn prior testimony from CSC executives that, at times, 99% of CSC's subcontracting dollars went to large businesses (Compl. ¶ 56), and that engaging in such pass-through schemes is "not an uncommon thing" (*id.* ¶ 163). Additionally, the complaint cites emails from CSC that make it clear that operating in this manner was a common practice that CSC adopted in order to enable it to comply with the small-business threshold requirements of the September 2008 Task Order. (*See id.* ¶ 91.) *Cf. Kowal*, 16 F.3d at 1279 n. 3 (information and belief pleadings require only "a statement of the facts upon which the allegations are based").

CSC also argues that Relator fails to allege adequately the "materiality" aspect of its Presentment and Material False Statements counts, because its "materiality allegations are nothing but conclusions that merely parrot the FCA materiality requirement" and lack any "specific factual basis to support those contentions." (CSC

Br. at 30.)  But this assertion ignores the language of section 52.219-9(k) of Title 48 of the C.F.R., a provision of the FAR that was expressly incorporated into the September 2008 Task Order and that specifically provides:  "[t]he failure of the Contractor or subcontractor to comply in good faith with (1) the clause of this contract entitled 'Utilization Of Small Business Concerns,' or (2) an approved plan required by this clause, *shall be a material breach of the contract*."  48 C.F.R. § 52.219-9(k) (emphasis added).  This regulation is cited in the complaint.  (*See* Compl. ¶ 42.)  The complaint also contains several allegations of fact that attest to the materiality of the small business provisions of the pertinent task order.  In particular, the complaint asserts that CSC executives testified that CSC was "obligated to meet [the small business subcontracting requirement] from the day [CSC] started work until the day [CSC] finish[ed] work on this task order" (Compl. ¶ 86); that those same executives "monitored [compliance with the subcontracting plan] closely" (*id.* ¶ 166); and that the small business subcontracting goals were "important to" CSC because failing to meet its goals under the plan could result in "loss of the [task order]" (*id.* ¶ 109).  These statements must be accepted as true at this stage of the litigation, and they provide an ample basis for drawing an inference that the small business provisions were material to the September 2008 Task Order, and by extension, to the government's decision to pay CSC's claims.  In light of these statements and the express contractual language attesting to the materiality of the Small Business Subcontracting Plan, the Court concludes that Relator has adequately alleged the materiality of the provisions at issue based both on the language of the contract itself and the understanding of the parties that entered into it.  *See SAIC*, 626 F.3d at 1269 ("The existence of express contractual

language specifically linking compliance to eligibility for payment may well constitute dispositive evidence of materiality[.]"[10]

In the end, this Court is convinced that the specificity with which Relator has identified the allegedly false claims and statements at issue and the scheme that underlies them is sufficient to "ensure that defendants have adequate notice of the charges against them to prepare a defense." *McCready*, 251 F. Supp. 2d at 116. In addition, the complaint also adequately alleges that CSC's false certification of compliance with the Small Business Subcontracting Plan was material to the government's decision to pay the claims. Accordingly, the Court will deny CSC's motion to dismiss the Presentment and Material False Statements counts that have been brought against CSC.

b. The Presentment and Material False Statements
   Counts Against Modis

Although Relator has sufficiently stated valid Presentment and Material False Statements counts against CSC, the same is not necessarily true for these counts as brought against Modis because Modis played a substantially different role with respect to the allegedly fraudulent activity at issue here. Relator's presentment and false statement claims against Modis are premised on the allegation that Modis was generally involved in devising and maintaining the pass-through scheme along with CSC, and

---

[10] CSC also urges the Court to find that compliance with the Small Business Subcontracting Plan was not material to the government's decision to pay the claims because "small business subcontracting plans are a nearly universal ancillary element of large U.S. Government procurement contracts" and constitute only "minor contractual provisions" in those contracts. (CSC Br. at 31.) That may be so, but the applicable statutes make clear that having a Small Business Subcontracting Plan was a significant requirement of bidding on the government contracts at issue, *see* 15 U.S.C. § 637(d)(4), and at this early stage of the case, this Court will not assume that Congress actually intended otherwise. It may well be that the evidence will ultimately show that compliance with the small business requirements was not material to the government's decision to pay the invoices related to the September 2008 Task Order. But the complaint has adequately alleged facts that permit the inference that compliance with the small business provisions was material to the government's payments.

therefore Modis is liable for having "cause[d CSC's false claims] to be presented" as well as for having "cause[d CSC's false statements] to be made." 31 U.S.C. § 3729(a)(1)(A), (B). (*See* Compl. ¶ 193 ("By knowingly participating in the 'pass-through' scheme with CSC, Modis . . . knowingly caused each of these false claims to be presented and is likewise liable for the resulting damages."); ¶ 215 ("Modis . . . knowingly caused the submission of these false statements in order that CSC get paid for false claims under the USCIS Contract.").)

"For a plaintiff to allege a cause of action under § 3729(a)(1)'s 'causes to be presented' prong, it must [also] allege that the defendant's conduct was 'at least a substantial factor in causing, if not the but-for cause of, submission of false claims.'" *United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011) (quoting *Miller v. Holzmann*, 563 F. Supp. 2d 54, 119 n. 95 (D.D.C. 2008)). Put differently, "[t]he False Claims Act extends beyond the person making a false claim to one who engages in a fraudulent course of conduct that induces payment by the government." *McCready*, 251 F. Supp. 2d at 120 (internal quotation marks and citations omitted); *see also U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943) (noting that the "causes to be presented" and conspiracy provisions of the FCA "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud").

Courts have addressed the question of whether or not a party that did not actually submit false claims or make false statements to the government can be held liable on a "causes to be presented" theory in a variety of contexts. The paradigmatic case occurs when the non-submitting party takes advantage of an unwitting intermediary, thereby

causing that party to submit a false claim. For example, a subcontractor may be liable for causing false claims to be submitted under the FCA "if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the government to pay its claim." *United States v. Honeywell Intern. Inc.*, 798 F.Supp.2d 12, 24 (D.D.C. 2011); *see also United States v. Bornstein*, 423 U.S. 303, 309 (1976) ("It is settled that the [False Claims] Act . . . gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government."). Courts have also credited allegations that a non-submitting party caused false claims to be submitted in a variety of contexts where the non-submitter was the driving force behind an allegedly fraudulent scheme. *See, e.g.*, *Toyobo*, 811 F. Supp. 2d at 48 (bullet-proof material manufacturer's obfuscation of product defects caused vest manufacturers to submit false claims); *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 395 (1st Cir. 2011) (medical device manufacturer's kickback scheme caused doctors to submit false claims); *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004) (medical device manufacturer's illegal marketing scheme caused medical service provider to submit false claims); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 445 (S.D.N.Y. 1999) (travel agency's illegal use of non-profit bulk mailing rate caused its mailing agent to submit false claims to the U.S. Postal Service).

Moreover, even where the non-submitting entity was not the prime mover of the alleged fraud, courts have found such entities potentially liable on the theory that they caused the presentation of false claims where they had agreed to take certain critical actions in furtherance of the fraud. *See, e.g.*, *U.S. ex rel. Sikkenga v. Regence*

*Bluecross Blueshield of Utah*, 472 F.3d 702, 715 (10th Cir. 2006) (complaint adequately stated a claim against private Medicare provider for "agreeing to circumvent contractual and statutory requirements, and assuring [laboratory] that [it] would continue to accept" the allegedly false claims). In fact, some courts have concluded that even allegations that a non-submitter continued to do business with an entity upon becoming aware that that entity was submitting false claims were sufficient to show that the non-submitter had "caused" the claims' submission. *See, e.g.*, *U.S. ex rel. Long v. SCS Bus. & Technical Inst.*, 999 F. Supp. 78, 91 (D.D.C. 1998) *rev'd on other grounds sub nom. U.S. ex rel. Long v. SCS Bus. & Technical Inst., Inc.*, 173 F.3d 870 (D.C. Cir. 1999) (complaint adequately alleged that state officials caused false claims to be submitted by failing to act on knowledge of fraudulent conduct); *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004) ("Where a defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the government." (internal quotation marks and citations omitted)); *but see Sikkenga*, 472 F.3d at 714-15 (holding that liability under a causation theory "requir[es] more than mere passive acquiescence"). As a whole, these cases indicate that, in examining whether a non-submitting party has "caused" the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission.

In the instant case, while the allegations in the complaint indicate that it was CSC, not Modis, that was the primary architect and beneficiary of the pass-through scheme, it is abundantly clear that Modis's participation in the scheme was sufficient to constitute a "substantial factor in causing" CSC's submission of the false claims. *Toyobo*, 811 F. Supp. 2d at 48. As detailed at length above, the complaint is replete with allegations regarding Modis's role in the pass-through scheme, such that there is no doubt that Modis was fully aware of, and an active participant in, the arrangement that facilitated CSC's eventual submission of allegedly false claims and false statements. For example, the complaint repeatedly quotes Modis's sales director Tim Martin as stating that Modis's goal in implementing the pass-through scheme was to "support [CSC's] needs to increase its small business spend within its subcontract community" (Compl. ¶ 107), and that he "worked with other small business vendors . . . to assist CSC in obtaining it small business spend" (*id.* ¶ 156). Additionally, according to the complaint, it was Martin who had suggested using Infotran as "a conduit for Modis in the provision of services to CSC for the purpose of expanding its small business spend[.]" (*Id.* ¶ 111.) If proven, these allegations would be sufficient to establish that Modis was well aware that its actions in implementing the pass-through scheme would cause CSC's eventual submission of allegedly false claims and false statements about its compliance with the small-business subcontracting requirements, and that Modis's actions were in fact a substantial factor in causing those submissions.

Indeed, Modis offers no argument to the contrary; instead, it retreats to the contention that Relator has failed to state a claim against Modis with the requisite particularity required by Rule 9(b), because the complaint does not contain any

"specific instance of fraud linking Modis to a fraudulent scheme with . . . CSC in a concrete way[.]" (Modis's Mem. in Supp. of Mot. to Dismiss ("Modis Br."), ECF No. 29, at 19.) However, as explained above, such specificity is more than Rule 9(b) requires. The complaint sufficiently identifies the details of CSC's alleged submission of false claims and false statements for Rule 9(b) purposes. More to the point, the complaint specifies in great detail the nature of the scheme put into place to enable those false claims, and it relates specifically Modis's pervasive involvement in that scheme. (*See, e.g.*, Compl. ¶¶ 77-78, 111.) Having already concluded that Relator has adequately pled his Presentment and Material False Statements counts against CSC for its direct submissions to the government, this Court has no trouble finding sufficient allegations in the complaint to support Relator's assertion that Modis caused those submissions under the standards relevant to the FCA. Accordingly, the Court will deny Modis's request to have the Presentment and Material False Statements counts against it dismissed.

c. The Presentment and Material False Statements Counts
   Against Sagent

Relator has alleged his Presentment and Material False Statements counts against Sagent as well as against CSC and Modis, but the complaint contains only a few allegations of fact that relate to Sagent specifically. In particular, the complaint quotes emails between Modis and CSC indicating that Sagent played the role of a conduit under the pass-through scheme (Compl. ¶ 89), as well as internal CSC emails to the same effect (*id.* ¶ 91). The complaint also alleges that four employees of a different large business called Compuware were funneled through Sagent to CSC (*id.* ¶¶ 92-99), and that, in total, approximately 15 employees were funneled to CSC through Sagent

from various large businesses (*id.* ¶ 101).  This is the sum total of the allegations involving Sagent.

These allegations are insufficient to state a claim against Sagent for causing false claims to be presented or causing material false statements to be made.  In particular, the complaint is devoid of any allegations concerning Sagent's knowledge of the small business requirements under the September 2008 Task Order and the Small Business Subcontracting Plan imposed on CSC, nor are there any allegations of fact that would support any inference that Sagent knew there was a link between those contract requirements and the pass-through dynamic.  Such knowledge is the linchpin of establishing fraud under the circumstances presented, and thus it is a necessary element of Relator's allegation that Sagent wrongfully participated in a pass-through scheme that was designed and administered to enable CSC to certify falsely that it was in compliance with its Small Business Contracting Plan.  *See* 31 U.S.C. § 3729(a)(1)(A) (imposing liability on any person who "*knowingly* presents, or causes to be presented, a false or fraudulent claim for payment") (emphasis added); *see also Kane*, 798 F. Supp. 2d at 196 ("The elements of a presentment claim are that (1) the defendant submitted [or caused to be submitted] a claim to the government, (2) the claim was false, and (3) *the defendant knew the claim was false*." (emphasis added)).

The FCA provides a specific definition for the requisite knowledge element of a viable FCA claim:

> (1) the terms "knowing" and "knowingly"—
>     (A) mean that a person, with respect to information—
>         (i) has actual knowledge of the information;
>         (ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information . . . .

31 U.S.C. § 3729(b). In contrast to the allegations against CSC and Modis, the complaint lacks allegations from which the Court can infer Sagent's knowledge of the alleged false claims under any of these standards. For example, while Relator provides myriad instances of communications between CSC and Modis regarding the purpose, structure, and mechanics of the pass-through scheme (and thus their knowledge of it), the complaint contains no allegations regarding the substance of any communications between Sagent and any of the other relevant parties. Moreover, the complaint lacks any suggestion that Sagent was even aware that its business relationship with CSC was part of a broader plan related to CSC's purported fulfillment of its small business obligations.

Relator contends that such allegations are not needed, because otherwise Sagent would be permitted to escape liability on the basis that it was a "uniquely obtuse ostrich with its head in the sand[,]" and that such "deliberate ignorance" is specifically covered under the definition set forth in 31 U.S.C. § 3729(b)(1)(A)(ii). (Relator's Mem. in Opp'n to Defs.' Mots. to Dismiss ("Relator's Opp'n"), ECF No. 33, at 29.) But Relator's argument here puts the cart before the horse—before Sagent can be accused of ignoring information, it must be aware that such information exists. In this case, the relevant information is that CSC was submitting false claims to the government, and that the submitted claims were rendered false largely because of a pass-through scheme that Modis and CSC devised. Unlike Infotran, Sagent may have been a willing conduit, but unwitting voluntary participants do exist, and Relator does not make any allegations regarding the extent of Sagent's knowledge that the pass-through business arrangement

was established and maintained for the purpose of permitting CSC to represent falsely that it satisfied the requisite small business contracting requirements. The disconnect between what Relator alleges with respect to Sagent and the requisite knowledge Sagent must have possessed in order to violate the FCA leads the Court to conclude that Relator has failed to state a claim against Sagent.

> 3. Relator Has Adequately Alleged Fraudulent Inducement Against CSC

Relator's Fraudulent Inducement count (Count II)—which is styled as "Making Material False Statements to Obtain the September 2008 Task Order" (Compl. at 48)—is alleged against CSC only, and is the only count in the complaint that arises wholly under a version of the FCA that has since been amended. *See supra* n. 9. Relator alleges a violation of the former section 3729(a)(2) of Title 31, which prohibited any person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." *See* 31 U.S.C. § 3729(a)(2) (2008). The factual basis of this count in the complaint is Relator's allegation that "the Small Business Subcontracting Plan that CSC submitted on or about May 16, 2008[,] contained material false statements and certifications regarding CSC's intent to actually utilize Small Business resources." (Compl. ¶ 202.) Relator further alleges that, but for CSC's representations that it would employ small businesses in the manner set out in the Small Business Subcontracting Plan, the government would not have awarded the September 2008 Task Order to CSC, nor would it have subsequently paid any of the invoices that CSC submitted under that contract. (*Id.* ¶¶ 205-6.)

The viability of an allegation of fraudulent inducement in violation of the FCA is well-established. Indeed, "[e]ven in the absence of allegations that the claims [for payment] themselves were false, . . . [payment] claims alleged to have been submitted under a contract procured by fraud can be actionable." *Toyobo*, 811 F. Supp. 2d at 46; *see also Kane*, 798 F. Supp. 2d at 196 (same). When the FCA was amended in 1986, Congress specifically recognized the "fraudulent inducement" theory of FCA liability, noting that "'each and every claim submitted under a contract . . . or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct . . . constitutes a false claim'" under section 3729(a). *Bettis*, 393 F.3d at 1326 (quoting S.Rep. No. 99–345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274). Thus, in Relator's view, regardless of the falsity of any particular (express or implied) statement made when CSC submitted the actual claims for payment, all such invoices were false claims because CSC procured the September 2008 Task Order by fraudulently representing its intention to comply with the Small Business Subcontracting Plan.

It is clear on the face of the complaint that Relator has adequately alleged a fraudulent inducement claim. Specifically, the complaint alleges that "[o]n or about May 16, 2008, CSC submitted a bid to the United States" for the September 2008 Task Order, and that "[a]long with its bid, CSC presented a 'Small Business Subcontracting Plan' in which it represented that a minimum of forty percent (40%) of its subcontractor spending" would go to small business subcontractors. (Compl. ¶ 3.) The complaint further alleges that "[t]his representation was false, as CSC never had any intention of complying with its subcontracting plan." (*Id.*; *see also id.* ¶ 66 ("CSC had no intention

of actually utilizing Small Businesses.  Instead, CSC" used small businesses merely as fronts "to pass through [work to] its Large Business" employees.))  And to support this allegation, the complaint provides myriad details of exactly how CSC adopted a pass-through scheme to shroud its allegedly willful misrepresentations regarding its intention to comply with the terms of the Small Business Subcontracting Plan.  For example, the complaint alleges that, on October 10, 2008—less than one month after the September 2008 Task Order was awarded to CSC—Jim Pizzola, CSC's Applications Program Manager for that contract, told his boss, CSC Program Manager Ken Harvey, in writing that Pizzola had "talked to [Modis's sales director] Tim Martin this afternoon," and

> told Tim that our small sub, large sub mix needed adjusting and MODIS must work-thru small subs for future candidates. Tim said you talked to him about it and Tim would work-thru Infotran. . . . Finally, I told him we needed to start thinking about running existing MODIS personnel thru Infotran.

(Compl. ¶ 130.)  Similarly, according to the complaint, Tim Martin made sure that Tran was aware of the pass-through arrangement and emphasized that implementing the pass-through scheme was the reason why Modis agreed to the changed business relationships that occurred after the September 2008 Task Order was awarded to CSC.  (*See id.* ¶ 150.)[11]  The complaint also maintains that Martin testified in prior litigation that

---

[11] Indeed, the complaint states that Martin sent an email to Tran at Infotran on March 20, 2009, that stated, in relevant part:

> Let me be perfectly clear.  Infotransys is a subcontractor to Modis on the CSC USCIS EAGLE contract.  Modis has elected to allow Infotransys to obtain a subcontract [directly] with CSC *for the sole purpose of acting as a small business conduit* for Modis to continue to provide resources to CSC while helping them meet their small business quota and at the same time creating additional (pass-through) revenues for Infotransys for its services.

(*Id.* ¶ 150 (emphasis added).)

> [CSC's] Ken Harvey was aware of the agreement to allow
> Infotran to act as a conduit for Modis to support CSC's
> needs to grow its small business spend[ing] from day one. It
> was he who suggested that additional subcontract small
> business spend[ing] was necessary and that -- and applauded
> my suggestion that Infotran be allowed to act as a pass-
> through, an administrator, a conduit for Modis in the
> provision of services to CSC for the purpose of expanding
> its small business spend[ing] from day one.

(*Id.* ¶ 128; *see also id.* ¶ 129 ("Mr. Harvey confirmed his knowledge of the pass-

through agreement at his own deposition, testifying on October 27, 2010 that he

understood that Modis would place personnel on the USCIS Contract 'through

Infotran.'")  These allegations are more than sufficient to raise an inference that the

September 2008 Task Order was fraudulently induced because CSC had intended to

utilize a pass-through scheme "from day one" (*id.* ¶ 128), despite the fact that CSC

represented to the government that it would engage in 40% small business

subcontracting pursuant to its Small Business Subcontracting Plan.

CSC nevertheless argues that the complaint fails to state a fraudulent inducement

claim because it contains no allegations that CSC's allegedly fraudulent and intentional

noncompliance with its own Small Business Subcontracting Plan constituted "prompt,

substantial nonperformance."  (CSC Br. at 18 (quoting *U.S. ex rel. Wilson v. Kellogg

Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008).)  The "prompt, substantial

nonperformance" requirement means that the party's alleged failure to perform in

accordance with its representations must have been a substantial breach of the

agreement that occurred swiftly after the representation was made, *see Wilson*, 525 F.3d

at 380, and is premised on the reasoning that a party should not be held liable if it does,

in fact, perform the agreement consistent with its obligations, despite its original

fraudulent intentions. *See U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) ("It would be illogical to find fraud where a party secretly did not intend to perform the contract when it was signed, but in actuality did perform[.]"). In this regard, CSC relies on a Fourth Circuit case that is not binding authority in this jurisdiction and is of questionable value, given that recent FCA fraudulent inducement cases from this district make no mention of any requirement that non-performance be "prompt" or "substantial." *See, e.g.*, *Kane*, 798 F. Supp. 2d at 198 (allegation that defendant made false representations regarding its compliance with the Small Business Act sufficient to state a claim for fraudulent inducement under the FCA); *Honeywell*, 798 F. Supp. 2d at 22 (allegations that United States would not have entered into contracts absent defendant's false statements were sufficient to state a claim for fraudulent inducement under the FCA).

Even if the requirement of "prompt" and "substantial" non-compliance for the purpose of sustaining a fraudulent inducement allegation applies, this Court is satisfied that the instant complaint alleges sufficient facts to meet that standard. Specifically, Relator alleges that "CSC relied heavily on subcontracts with Modis and other Large Businesses for the human resources it needed to perform" its obligations under the task order "[f]rom the beginning[.]" (Compl. ¶ 56; *see also id.* (quoting CSC's program manager as testifying that 99% of CSC's subcontracting was with large businesses).) Moreover, the complaint makes numerous allegations regarding Defendants' actions with respect to their obligations under the Small Business Subcontracting Plan and events that occurred mere months after the September 2008 Task Order went into effect (*see, e.g.*, *id.* ¶¶ 130, 132, 167-68), and it repeatedly maintains that the nonperformance

was a material breach of the task order contract (*see, e.g.*, *id.* ¶¶ 42, 61, 64, 135). When viewed in light of Relator's contention that CSC and Modis devised the pass-through scheme for the purpose of being able to make the (fraudulent) representation that CSC would rely on small businesses as necessary to win the September 2008 Task Order bid, the complaint's allegations regarding the early steps that were taken to implement that scheme are sufficient to show that CSC's alleged fraudulent failure to comply with its own Small Business Contracting Plan was both prompt and substantial.[12]

### B. Relator's Conspiracy Count

Relator's Conspiracy count alleges that CSC and Modis engaged in a conspiracy to present false claims in violation of FCA section 3729(a)(1)(C). As noted previously, that section specifically provides that anyone who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is subject to liability. *Toyobo*, 811 F. Supp. 2d at 50. Although "[t]he FCA does not define a conspiracy[,] . . . courts have held that general civil conspiracy principles apply to FCA conspiracy claims." *Id.* Therefore, to state a claim under the FCA for conspiracy, a plaintiff must plead that (1) the defendant "conspired with one or more persons to have a fraudulent claim paid by the United States"; (2) "one or more of the conspirators performed any act to have such a claim paid by the United States"; and (3) "the United

---

[12] This Court strongly suspects that CSC's argument about "prompt" and "substantial" non-compliance is really not about the timing or extent of the alleged non-compliance at all, but instead marks the return of CSC's misguided contention that there was no non-compliance here in any event because the pass-through scheme was an entirely appropriate means of satisfying its obligation to comply with the Small Business Subcontracting Plan and Relator fails to state facts that establish otherwise. This Court has repeatedly rebuffed the many other iterations of this assertion that CSC makes in other contexts, *see supra* Parts III.A.1; III.A.2.a.ii, but it keeps on coming back in other guises. To the extent that it arises here again, the Court sincerely hopes it has done enough to finally put that dreaded claim to rest. *Cf. Zombie Killing,* Zombiepedia, http://zombie.wikia.com/wiki/Zombie_Killing (last visited July 2, 2014) (noting that "[i]t will rarely take only one swing" to kill a zombie).

States suffered damages as a result of the claim." *United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994); *see also Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) ("The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." (internal quotation marks and citation omitted)).

Given the complaint's description of the relationship between CSC and Modis that has already been described at length (and in particular, in the prior discussion of Relator's fraudulent inducement claim, *see supra* Part III.A.3), this Court concludes that Relator's conspiracy claim is adequately pled. In short, the complaint contains numerous allegations regarding the agreement between CSC and Modis as it relates to the development and maintenance of the pass-through scheme. CSC executives were in frequent contact with at least one Modis representative who allegedly agreed that Modis "must work-thru small subs" to assist CSC in fulfilling its obligations under the September 2008 Task Order because CSC's "small sub, large sub mix needed adjusting[.]" (Compl. ¶ 223.) Moreover, the complaint is replete with allegations concerning actions that these two parties took in furtherance of that agreement. (*See, e.g.*, *id.* ¶ 78 (describing Modis's proposal that Infotran become a direct subcontractor to CSC); ¶ 150 (describing Modis's admonishment of Infotran for placing its own people with CSC, rather than Modis's).) What is more, according to the complaint, the agreement between CSC and Modis to implement the pass-through scheme resulted in "the creation and submission to the United States of false statements consistent with the

fraudulent nature of the pass-through scheme" (*id.* ¶ 224), which caused harm to the government because the government allegedly would not have paid the allegedly fraudulent claims had it known of the pass-through scheme (*id.* ¶¶ 174-176). Thus, the established elements of an FCA conspiracy claim—that there was an agreement between two or more actors to have a false claim paid; that the conspirators committed at least one act in furtherance of that aim; and that the United States suffered damages as a result—are easily satisfied.

CSC and Modis offer two arguments to the contrary. First, these Defendants contend that they cannot be held liable for engaging in an illegal conspiracy because there has been no illegal action alleged. (*See* CSC Br. at 20-21); *see also Exec. Sandwich Shoppe*, 749 A.2d at 738 (under D.C. law, civil conspiracy is not an independent tort but rather "depends on performance of some underlying tortious act") (internal quotation marks and citations omitted). This argument once again harkens back to CSC's surprisingly resilient contention that federal contracting law permits the type of pass-through scheme that Relator challenges—a claim that the Court has repeatedly rejected. *See supra* Part III.A.1; *see also* Part III.A.3 & n. 12.

These Defendants' second retort is that the complaint fails to allege specific facts supporting an inference that there was an actual agreement and that the agreement was for the purpose of accomplishing an unlawful act—here, the submission of false claims. But it is well-established that a plaintiff need not allege that an express or formal agreement was entered into in order to establish that the parties were in agreement for the purpose of a conspiracy claim. *Cf. Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983) (noting that "courts have to infer an agreement from indirect evidence in

most civil conspiracy cases"); *U.S. ex rel. Wilkins v. N. Am. Const. Corp.*, 173 F. Supp. 2d 601, 641 (S.D. Tex. 2001) (finding circumstantial evidence sufficient to support an FCA conspiracy claim). And in this case, the allegations cited above provide sufficient grounds to support an inference that CSC and Modis had an agreement to implement the allegedly illegal pass-through scheme. To take just the most obvious example, the complaint alleges that Ken Harvey of CSC spoke directly with Modis's sales director and "applauded [Modis's] suggestion that Infotran be allowed to act as a pass-through, an administrator, a conduit for Modis in the provision of services to CSC for the purpose of expanding its small business spend[.]" (Compl. ¶ 129.) In addition, the factual allegations in the complaint also support an inference that the purpose of the concerted pass-through scheme was to enable CSC to certify falsely to the government that it was in compliance with the small-business subcontracting goals contained in the September 2008 Task Order. (*See, e.g.*, *id.* ¶¶ 111, 128.) Despite the fact that there is no particular allegation in the complaint to the effect that CSC and Modis agreed to present any particular false invoice under the September 2008 Task Order, Modis was undoubtedly aware that CSC would be submitting invoices to the government under the task order, and the complaint alleges that CSC and Modis restructured the manner in which Modis served CSC in order to accomplish the arrangement that facilitated the fraudulent procurement of the task order itself. (*See, e.g.*, *id.* ¶ 133.) This Court concludes that an agreement to restructure business relationships so as to facilitate false representations to the government fits comfortably within the category of compacts that qualify as agreements to submit false claims for the purpose of an FCA conspiracy allegation. Accordingly, Relator's complaint alleges facts that are sufficient to support

its conspiracy count, and this Court rejects all of CSC's unpersuasive arguments to the contrary.[13]

### C. Relator's Retaliation Count

The complaint's final count (Count V) is brought against CSC and Modis on the grounds that these Defendants allegedly retaliated against Relator in violation of the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h).  (Compl. ¶¶ 235-242.)  Section 3730(h) provides that

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

The retaliation provision of the FCA "was designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime."  *U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1237 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  In order to state a claim for retaliation, a relator "must demonstrate that: (1) he engaged in protected activity, that is, 'acts done . . . in furtherance of an action under this section';

---

[13] Among the additional arguments that CSC puts forward is its assertion that, in an email quoted in the complaint, Tim Martin specifically asked Tran to "[p]lease refrain from discussing [the pass-through scheme] with our client (CSC) as that would breach confidentiality agreements, and likely cause future damage to all parties[,]" which according to CSC, proves that there was no agreement between CSC and Modis.  (CSC Br. at 22 (citing Compl. ¶ 150).)  But the allegations in the complaint must be viewed in the light most favorable to Plaintiff.  Given Tran's alleged resistance to the pass-through proposal, this email statement could just as easily be viewed as evidence of Modis's attempt to limit Tran's discussions relating to what he apparently believed was unlawful conspiracy, rather than evidence that no such conspiracy existed.

and (2) he was discriminated against 'because of' that activity." *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting 31 U.S.C. § 3730(h)).

1.   The Complaint Contains No Allegations Of "Protected Activity"

To satisfy the first requirement of a retaliation claim, Relator primarily relies on the fact that he allegedly refused to participate in the pass-through scheme, which he argues qualifies as "protected activity" to the extent that it evidences his "attempt[] to prevent CSC from making false statements and presenting false claims to the United States." (Compl. ¶¶ 157, 237.) Relator argues that his refusal to participate constitutes an "effort[] to stop [one] or more violations" of the FCA within the meaning of section 3730(h) (Relator's Opp'n at 43), but Relator has identified no case in which any court has concluded that mere refusal to participate in an allegedly fraudulent scheme constituted "protected activity" sufficient to trigger the protections of the FCA retaliation provision. Rather, Relator appears to be relying on the legislative history of the FERA amendments to the FCA to support his contention that a refusal to participate amounts to protected activity under the FCA—a position that CSC does not contest. (*See* CSC Br. at 24 (acknowledging based on a reading of the legislative history that "refusals to participate" constitute protected activity under the FERA amendments).

Prior to the enactment of FERA, the retaliation provision of the FCA specifically listed the "lawful acts" for which an employee was entitled to protection, and this list "include[d] investigation for, initiation of, testimony for, or assistance in an action to be filed" under the FCA. 31 U.S.C. § 3730(h) (2003). The FERA amendments both removed this list and added the more general statement that, not only acts done "in furtherance of" an FCA action, but also "other efforts to stop 1 or more violations of

this subchapter" are protected under the retaliation provision. This change was presumably intended to broaden the scope of the activities that a relator might have engaged in for the purpose of statutory protection from retaliation, and at least one piece of the legislative history appears to indicate that the revised provision was sufficiently broadened that it included refusals to participate in the scope of protected activity. *See* 155 Cong. Rec. E1295-03 (Statement of Rep. Berman) ("This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual qui tam action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual qui tam action.").

As reasonable as this reading of the history of the FCA might seem, it is well-established that legislative history cannot be used to demonstrate that a statute means something that is manifestly inconsistent with its text, *see, e.g.*, *United States v. Fisher*, 6 U.S. 358, 399 (1805) (Marshall, C.J.), and the text of the FCA tells a far different story regarding the scope of the retaliation provision. The amended FCA states unequivocally that a relator is protected from retaliation only insofar as he has been retaliated against for engaging in *two categories of conduct*: (1) "lawful acts done . . . in furtherance of an action under this section[,]" or (2) "other efforts to stop 1 or more violations of this subchapter[.]" With rare exception, the mere refusal to participate in an allegedly unlawful scheme is neither an "act[] done" nor an "effort[]" taken, and such forbearance certainly does not equate with the kind of affirmative activity that the

text of the statute conveys. Relator has not cited, and this Court has not found, a single case in which a court decided that the refusal to participate in allegedly fraudulent conduct, standing alone, was "protected activity" for the purpose of an FCA retaliation claim, and even when courts assessing FCA retaliation claims have mentioned with some approval a relator's refusal to participate in a fraudulent scheme, that fact is inevitably coupled with actual actions that the relator took either to promote its FCA suit, or to stop the alleged fraud. *See, e.g.*, *U.S. ex rel. Meyer v. Kempf Surgical Appliances, Inc.*, 11-cv-00111, 2013 WL 1438025, at *1 (S.D. Ohio Apr. 9, 2013) (finding that a relator had identified protected activity based on allegations that he "raised questions about Defendants' billing practices and refused to participate in the alleged fraud"); *Layman v. MET Labs., Inc.*, 12-cv-2860, 2013 WL 2237689, at *7 (D. Md. May 20, 2013) (finding that a relator could proceed with a retaliation claim where he both refused to sign an allegedly fraudulent report and also conducted an investigation into the circumstances under which the report was created). Indeed, the weight of authority regarding what counts as "protected activity" within the meaning of the FCA's retaliation provision confirms that, ordinarily, something more than mere refusal to participate in the fraudulent activity is required. *See, e.g.*, *Hood*, 946 F. Supp. 2d at 87 (relator complained to supervisors and questioned alleged unethical activity in face-to-face meetings and e-mails); *Sharma v. District of Columbia*, 791 F. Supp. 2d 207, 218-19 (D.D.C. 2011) (relator repeatedly complained about fraud and corruption); *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 994 (D. Minn. 2013) (relator reported violations to supervisors and took notes of observations); *Bechtel v. St. Joseph Medical Ctr., Inc.*, 10-cv-3381, 2012 WL 1476079, at *6 (D. Md.

April 26, 2012) (plaintiff passed relevant information to a qui tam relator); *U.S. ex rel. George v. Boston Scientific Corp.*, 864 F. Supp.2d 597, 607 (S.D. Tex. 2012) (relator asked if a product "could be promoted legally" at a company meeting).

Perhaps sensing the weakness of his argument that a mere refusal to participate is "protected activity" for the purpose of the FCA's retaliation provision, Relator here also suggests that his discovery efforts in support of his counterclaim in the *Modis v. Infotran* action constitute "protected activity." (*See* Compl. ¶ 158 ("By pursuing its claims against Modis, [Relator] investigated the fraudulent pass-through scheme, which led to the filing of this action.").) But this argument fares no better because Relator has not shown that he *initiated* any "act" or "effort" with respect to that litigation. In contrast to the many cases in which a *plaintiff* states a separate retaliation claim for having initiated a lawsuit, Relator cites no authority for the proposition that bringing a *counterclaim* in a lawsuit that was filed against him falls within the scope of "lawful acts" protected by the FCA's retaliation provision. And when one considers that unlawful retaliation typically occurs in reaction to activity that has been undertaken for the purpose of exposing or halting illegal conduct, the conclusion that a counterclaim qualifies as protected activity is implausible on its face.

> 2. <u>The Complaint Does Not Contain Facts That Establish The Requisite Causal Connection</u>

Even if Relator was correct that his refusal to participate in the allegedly illegal pass-through scheme and/or his counterclaim against Modis constitutes protected activity, his retaliation claim would *still* fail because the allegations of the complaint do not compel the conclusion that CSC terminated Infotran because of the prior lawsuit or in retaliation for Relator's allegedly righteous refusal to participate in the pass-through

scheme. The "causation" element of a retaliation claim requires a relator to show both that "(a) 'the employer had knowledge the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'" *Yesudian*, 153 F.3d at 736 (quoting S. Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300.)

Here, the complaint leaves no doubt that CSC was aware that Infotran had refused to serve as a conduit for Modis and that the two companies were engaged in a legal dispute about that situation. (*See* Compl. ¶¶ 144-45.) In order to establish the requisite causation, Relator relies mainly on a March 20, 2009, email from Tim Martin of Modis to Tran, in which Martin asserts that "Modis has elected to allow Infotransys to obtain a subcontract with CSC for the sole purpose of acting as a small business conduit for Modis to continue to provide resources to CSC," and that Modis did not "agree to waive its non-compete to allow Infotran[] to provide direct staffing services to CSC at USCIS without Modis participation." (Compl. ¶ 150.) Relator contends that this email amounts to clear evidence that CSC terminated its relationship with Infotran because of the dispute over Tran's refusal to participate in the pass-through scheme. (Relator Opp'n at 43.) But this email demonstrates no such thing; indeed, it suggests precisely the opposite: that CSC's direct business relationship with Infotran was established originally "for the sole purpose" of facilitating the allegedly fraudulent scheme, such that once Infotran refused to do the job for which it was hired, CSC's motivation for terminating the relationship was likely futility, rather than retaliation. In other words, rather than improperly ending a business relationship that had previously existed for legitimate purposes in retaliation for Infotran's refusal to participate in the

fraud, the allegations of the complaint indicate that CSC's termination of the direct supplier relationship between CSC and Infotran was the reasoned result of Infotran's dogged refusal to fulfill the very function that the business relationship was created to achieve. Relator provides no other allegations that connect his refusal to participate with his company's termination by CSC; consequently, Relator has failed to allege adequately facts from which an inference of retaliation could properly be drawn.

3. <u>The Complaint Does Not Contain Facts To Support The Contention That Modis Committed A Retaliatory Act</u>

Finally, Relator's contention that Modis violated the FCA's retaliation provision because it filed a breach of contract lawsuit against him in direct response to his refusal to participate in the pass-through scheme (Compl. ¶¶ 236-238) also fails. The complaint alleges that, in October of 2008, "Martin telephoned Relator Tran and threatened him and Infotran with legal action if Infotran attempted to place any future resources" with CSC under the September 2008 Task Order "without the involvement of Modis." (*Id.* ¶ 117; *see also id.* ¶ 150 (Modis allegedly warned that "[a]ny further violation of the Modis Independent Contractor Agreement with Infotransys has a clear and indesputable [sic] recourse"); *id.* ¶ 152 ("[W]hen it was clear that Modis would be unable to force Infotran to participate in the pass-through scheme, Modis retaliated by filing a single count breach of contract Complaint" against Relator).) Even if it is assumed that refusal to participate in the pass-through scheme was "protected activity" and thus a sufficient trigger for a retaliation claim under the FCA (it is not, *see supra* Part III.C.1), an allegedly retaliatory lawsuit does not meet the statutory requirement that a relator alleging retaliation must have been "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against *in the terms and*

*conditions of employment*[.]" 31 U.S.C. § 3730(h) (emphasis added). Modis's filing of

a civil lawsuit alleging breach of contract has nothing to do with the "terms and

conditions of employment," and Relator offers no authority that would lead the Court to

believe that the statute should be interpreted so broadly as to include such a claim. *See,*

*e.g.*, *Kane*, 798 F. Supp. 2d at 208 ("The plain language of th[e] phrase ['terms and

conditions of employment'] clearly establishes that section 3730(h) applies only to the

employment context[.]")

Accordingly, Relator has failed to allege a plausible claim that either CSC or

Modis retaliated against him in violation of the FCA, and Count V must be dismissed.

## IV.    CONCLUSION

For the reasons explained above, Relator has pled plausible claims against CSC

for the presentation of false claims, fraudulent inducement, and the making of material

false statements, and has plead each of these counts with the particularity Rule 9(b)

requires. Likewise, Relator's claims that Modis caused CSC to present false claims and

to make material false statements are also plausible, as is Relator's claim that CSC and

Modis conspired to commit each of these violations of the FCA. But Relator has not

satisfied the requisite pleading standards with respect to its retaliation count against

CSC and Modis, nor are there sufficient allegations in the complaint to support the

presentation and material false statements counts against Sagent, so those counts must

be dismissed.

It may well be that, once discovery in this case proceeds, all of Relator's claims

will be proven unfounded, either because the pass-through scheme did not operate in

the way Relator has alleged, or was immaterial to the payment of CSC's claims, or for

some other reason.  But based on the facts alleged in the complaint, and taking all of the allegations therein at face value, Relator has stated certain plausible claims against CSC and Modis based on their alleged agreement to implement a pass-through scheme in order to sidestep the promised small business requirements in a manner that rendered false CSC's submissions and representations to the government regarding its fulfillment of those requirements.  Consequently, this Court will **GRANT IN PART** and **DENY IN PART** CSC's Motion to Dismiss; **GRANT IN PART** and **DENY IN PART** Modis's Motion to Dismiss; and **GRANT** in full Sagent's Motion to Dismiss, as set forth in the accompanying order.

Date:  July 3, 2014                                    *Ketanji Brown Jackson*
                                                       KETANJI BROWN JACKSON
                                                       United States District Judge